**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**VICTOR DONTAVIOUS STALLWORTH,**

  **Plaintiff,**

**vs.**                                        **Case No. 4:11cv432-RH/CAS**

**SERGEANT S. TYSON,**

  **Defendant.**

_____/


## THIRD REPORT AND RECOMMENDATION[1]

This report and recommendation addresses Defendant's motion for summary

judgment, doc. 47, and motion for sanctions, doc. 49. The pro se Plaintiff was provided

an opportunity to respond to both motions, and provided a period of discovery to

support his case. Docs. 52, 62, 65, and 73. Plaintiff has filed responses, docs. 75-76,

and the motions are ready for a ruling.

**Plaintiff's allegations**

Plaintiff alleged in the amended complaint, doc. 11, that while he was

incarcerated at Taylor Correctional Institution, confined in general population, he

_____

[1] The first report and recommendation, doc. 14, concerned Plaintiff's motion for a preliminary injunction, doc. 13, which was denied. Doc. 19. The second report and recommendation, doc. 39, concerned Defendant's motion to dismiss, doc. 31, which dismissed the official capacity claims against Defendant Tyson. Doc. 51.

submitted a complaint against Defendant Tyson through the Department of Corrections' prison grievance procedures. Doc. 11 at 6. Plaintiff alleged that Defendant Tyson was informed that Plaintiff had filed a grievance against him and several days later, Tyson came to Plaintiff's cell and instructed Plaintiff to come to the door. *Id.* at 7. As Plaintiff did so, Tyson "simultaneously open the feeding flap on the Plaintiff's cell door and threw an open razor blade into his cell and started spraying him in the face with . . . pepper spray mace . . . ." *Id.* Plaintiff alleged that Tyson said, "This will give you something to think about the nexts [sic] time you decide to write me up . . . ." *Id.* Plaintiff claimed that Tyson attempted to justify the use of chemical agents by "falsely claiming that the Plaintiff had cut himself with the said open razor blade or was trying to cut himself with the said open razorblade . . . ." *Id.* at 8. Plaintiff said no cut marks were found on him, and no razor blade was ever found in Plaintiff's cell. *Id.* Plaintiff was then placed in a secured housing cell for three days because of Tyson's allegation, and he was unable to shower for three days or wear his own clothes, he had to "strip naked and" was given a "turtle suit" to wear, kept in an isolation room without covers, blankets, "or a proper bed." *Id.* at 9. Thus, Plaintiff alleged a violation of his Eighth Amendment rights and a violation of his First and Fourteenth Amendment rights by retaliating against Plaintiff for writing a grievance. *Id.* at 9.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment, the Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with

evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  <u>Hickson Corp. v. Northern Crossarm Co., Inc.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, <u>Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Hickson Corp.</u>, 357 F.3d at 1260, *quoting* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, <u>Watkins v. Ford Motor Co.</u>, 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts.  <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* <u>Ricci v. DeStefano</u>, 129 S.Ct. 2658, 2677 (2009).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Industrial Co.,</u> 475 U.S. at 587 (internal quotation marks omitted), *quoted in* <u>Ricci v. DeStefano</u>, 129 S.Ct. at 2677.

      "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The

nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement constitutes grounds for denial of the motion."  The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source."  N.D. Fla. Loc. R. 56.1(A).  The Local Rule further provides that the "party opposing a motion for summary judgment shall, in addition to other papers or matters permitted by the rules, file and serve a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried" using the same format.  <i>Id.</i>  Facts set forth in the moving party's statement "will be deemed to be admitted [if supported by the record evidence] unless controverted by the statement required to be filed and served by the opposing party.

In this case, both Defendant (the moving party) and Plaintiff submitted a statement of facts.  However, Plaintiff's statement of facts is not supported by the evidence and fails to reference the evidence relied upon for the assertion of facts.  Thus, Plaintiff's statement of facts is not evidence which may be considered and Defendant's statement must be deemed to be admitted.

**The Undisputed Relevant Rule 56 Evidence[2]**

On December 16, 2010, at approximately 2:30 a.m., Defendant Tyson ordered Plaintiff to provide a urine sample because Plaintiff's name appeared on the random drug testing list. Doc. 47, Ex. A (doc. 47-1).[3] Plaintiff submitted a urine sample "utilizing a multi-panel test card," which tested positive for marijuana. *Id.* at 1, 6. Plaintiff "contested the on site test and requested for the sample to be sent to an outside laboratory for further testing." *Id.* at 6. Plaintiff's sample was sent to Alere Toxicology Services, and on January 6, 2011, the report was received from Alere that Plaintiff "was positive for marijuana." Doc. 47-1 at 1. Plaintiff was issued a disciplinary report for unauthorized use of drugs on January 6, 2011, and after refusing to make a statement, Plaintiff was found guilty of the infraction, forfeited 58 days of gain time, and received 60 days in disciplinary confinement as punishment. Doc. 47-1. Defendant Tyson did not write the disciplinary report, nor did Tyson participate as a team member in determining Plaintiff's guilt in the disciplinary hearing. Ex. A (doc. 47-1 at 5).

On that same date, December 16th, Plaintiff submitted an informal grievance alleging that when Tyson woke him up for the urinalysis, Tyson said, "I remember those grievances and staff allegations you made on me in March." Doc. 47, Ex. B (doc. 47-2).

_____

[2] While Plaintiff submitted some evidence in this case, that evidence concerns copies of grievances, copies of Plaintiff's psychological screening at intake, copies of several of the same witness statements Defendant provided, and copies of Plaintiff's discharge summary for inpatient mental health care. Doc. 76, Exhibits A-C. None of those exhibits provide sworn statements from Plaintiff which concern the use of chemical agents against Plaintiff or the presence of a razor blade in his cell and are, accordingly, insufficient to demonstrate a genuine dispute of material fact.

[3] As the pro se Plaintiff does not have access to the Court's electronic docket, citations to the record are provided both to the exhibit number and then, in parenthesis, to the specific citation in the electronic docket.

Plaintiff alleged that Tyson then physically threatened him and said he would "stack up the DRs on" Plaintiff. *Id.* Plaintiff claimed that Tyson's actions were taken in retaliation against him for writing grievances in March (as will be explained *infra*), and that Tyson did not comply with the proper procedures for taking a urinalysis because, pursuant to Chapter 33, Plaintiff had the right to observe the test while it was being tested. *Id.* Plaintiff alleged in his grievance that Tyson "set me up or put something in the test." *Id.*

Prior to the urinalysis on December 16, 2010, Plaintiff had received a total of two disciplinary reports, one report was for lewd and lascivious exhibition, issued on March 5, 2010, by Officer English, and the second report was for lying in relation to the first disciplinary report. Doc. 47, Ex. C (doc. 47-3). After Plaintiff received the disciplinary report for lewd and lascivious exhibition, Plaintiff submitted a witness statement providing his version of the events which took place. *Id.* at 4. In his statement, Plaintiff claimed that Officer English was lying, that Sgt. Tyson had told him that he was only being charged with indecent exposure, and that "all the sergents [sic] includ[ing] Mr. Tyson made [English] lie on the DR so [Plaintiff] [could] catch 60 days in confinement." *Id.* at 4.

Although Tyson was not involved in issuing the disciplinary report against Plaintiff for lewd and lascivious exhibition, he was requested to provide a witness statement in light of Plaintiff's allegation against him in Plaintiff's statement. *Id.* at 3, 5. Tyson reported that while escorting Plaintiff "to medical for a pre-confinement physical he asked" Tyson if he was "being charged with gunning" and Tyson responded that he was. *Id.* at 5 (doc. 47-3 at 6). Tyson concluded his witness statement by asserting that Plaintiff was "lying in an official capacity on his statement of facts." *Id.* Thereafter,

Tyson wrote Plaintiff a disciplinary report for lying to staff on March 10, 2010.[4]  Doc. 47, Ex. D (doc. 47-4).  That second disciplinary report was issued nine months before Plaintiff was directed to provide the urine sample in December 2010.

As noted above, Plaintiff submitted an informal grievance on December 16, 2010, alleging that when Tyson directed him to take the urinalysis, it was due to retaliation for the grievance he filed against Tyson in March 2010.  Doc. 47-2 (Ex. B). Plaintiff also claimed that Tyson did not comply with proper procedures in administering the test.  *Id.*  The evidence reveals that Plaintiff received a response to that informal grievance on December 30, 2010, which advised that an investigation was conducted concerning the grievance and as part of that process, Tyson was interviewed.  Doc. 47-2 at 1.  Tyson denied making any threats to Plaintiff and said the "test was conducted according to procedure."  *Id.*

As evidence concerning the events which are at issue in this case, Defendant Tyson submitted the Case Summary from an Investigation in Case No. 11-2-0137 concerning a "Suicide Attempt."  Doc. 47, Ex. E (doc. 47-5).[5]  The Summary reveals that on January 1, 2011,[6] at approximately 1:31 a.m., Defendant Tyson was conducting

---

[4] For that disciplinary report, Plaintiff was placed in disciplinary confinement for 30 days, but not did lose gain time.  Doc. 47-4 at 3.

[5] Exhibit E consists of 32 pages and is located on the electronic docket as doc. 47-5.  The stamp at the bottom of the exhibit, however, incorrectly identifies the exhibit as Ex. D.  Exhibit D consists of 10 pages and is on the electronic docket as doc. 47-4.

[6] Plaintiff alleged in a grievance to the Secretary dated January 9, 2011, that Tyson came to his cell to retaliate against him with the use of chemical agents just two days after the investigation was conducted on Plaintiff's grievance concerning Tyson's involvement in the urinalysis.  Doc. 47-2 at 3.  Plaintiff alleged that his life was in danger at Taylor Correctional Institution.  *Id.*  Plaintiff's allegations were forwarded to the Inspector General's office for review.  *Id.* at 4.

a security check of inmates housed in G-Dorm.  Ex. E at 1; *see also* Ex. E at 11.  When

Tyson arrived at Plaintiff's cell, he observed Plaintiff with a razor blade in his hand, and

Plaintiff "began making threatening statements that he was going to kill himself."  Ex. D

at 1, 11.  Tyson ordered Plaintiff to relinquish the razor blade, but Plaintiff refused to

comply.  *Id.*  Tyson again ordered Plaintiff to cease his actions and relinquish the razor

blade, or Tyson said he would "administer chemical agents" to prevent Plaintiff from

injuring himself and gain Plaintiff's compliance.  *Id.*  Plaintiff refused to comply.  *Id.*

After two commands, Tyson then directed Plaintiff's cell mate (Michael Williams)

to stay in his bunk and "cover up with his blanket so that he would have only the

minimum exposure to the chemical agents to which he complied."  Ex. E at 4,[7] 11-12.

Tyson then dispersed chemical agents into Plaintiffs cell, striking Plaintiff in the upper

torso.  Ex. E at 10, 12 (doc. 47-5).  After Plaintiff complied with Defendant Tyson's

orders, Tyson reported that Plaintiff "flushed the razor blade down the toilet."  Ex. E at

12, 14, 23 (doc. 47-5).

The evidence also included a Case Summary for Investigation Case Number 11-

2-0256 for "Excessive Force" which was initiated by Sergeant Freeman as

"Complainant" and states:

> Sergeant Freeman reports he reviewed a witness statement from inmate
> Stallworth, Victor DC#E21503 in which he made allegations of excessive force.
> Stallworth alleges that he was set up, was not trying to kill himself, and that he
> didn't do anything to get sprayed.  This is in reference to use of force #11-218-
> 0001.

---

[7] Defendant's evidence also includes the Investigation for Case Number 2011-
218-0001, Use of Force to "Prevent Suicide Attempt."  Ex. E (doc. 47-5 at 4).

Ex. E at 3 (doc. 47-5). The Disposition states: "No Further review is warranted at this time, as the inmates allegations are not supported by the evidence reviewed and therefore are not substantiated." *Id.*

As part of Plaintiff's evidence, Plaintiff submitted his witness statement which was provided to Sgt. Freeman on January 6, 2011, several days after the incident. Doc. 76 at 44. Plaintiff reported that after Tyson completed the security check, Tyson came to Plaintiff's cell door and told Plaintiff to come to the door. *Id.* Plaintiff said:

> Sergeant Tyson then open the feeding flap and threw a open razor blade in my room. Then he sprayed me with his mase [sic]. He set me up, frame me as I try to cut myself and I had a razor blade.

*Id.* Plaintiff further claimed his cell mate is a witness along with another inmate who Plaintiff claimed "seen Sergeant Tyson throw the open razor blade in my room on January 1, 2011." *Id.* Plaintiff's cell mate, however, submitted a witness statement that said "Called to the trap. Got Sprayed." *Id.* at 45. Inmate Williams then said, "I was asleep. Shower Refused." *Id.* Another inmate statement was submitted by inmate Derek Brockington who said that he saw "Tyson make a round down stairs them come up stairs and when he got to the bottom he whent [sic] to 114 opend [sic] the flap the [sic] sprayed inmate Stallworth." *Id.* at 46.[8]

Tyson submitted two videos of the events surrounding the use of force, Doc. 47, Ex. F (Fixed Wing Video), and post use of force decontamination shower. Doc. 47, Ex. G (Handheld Video). Neither video reveals events which transpired inside Plaintiff's cell, particularly whether or not Plaintiff was holding a razor blade as asserted by Tyson.

---

[8] The two witness statements by Williams and Brockington are the only evidence Plaintiff referenced in his statement of facts besides the video evidence. Doc. 76.

 Yet, the video evidence does reveal that the events did not occur as alleged by

Plaintiff.[9]  The video shows that on January 1, 2011, at approximately 1:30 a.m.,

Defendant Tyson walks along the bottom row of cells in unit G4.  Doc. 47, Ex. F.  Tyson

holds a flashlight in one hand, and quickly shines the light in the long, narrow window of

each cell door as he passes by.  *Id.*  As Tyson approaches Plaintiff's cell door, he holds

a flashlight in his right hand, and the left hand appears empty.  *Id.*  Tyson stops and

spends several moments at the door before backing away, and making a movement

that appears consistent with moving the flashlight to the left hand, taking the chemical

agents in the right hand, breaking the seal, and then bending over in a manner which

appears as though Tyson is doing something at the door flap.  *Id.*  Tyson's exact

actions cannot be clear because a staircase blocks a clear view from the camera

position; however, the video shows that Tyson did not make movements consistent with

Plaintiff's allegation that when Tyson came to Plaintiff's cell, he already had the

chemical agents out and ready to use, and immediately administered the agents in

Plaintiff's face.[10]  *See* doc. 11, doc. 76.  The time on the video when Tyson arrives at

the cell door is 1:31:23:406.  *Id.*  The time when Tyson bends down in a movement

consistent with spraying chemical agents in the door's flap is 1:31:42:156.  *Id.*  Tyson

remains at Plaintiff's cell door until 1:32:34:875.  *Id.*  That provided sufficient time for

---

[9] Plaintiff had alleged that simultaneously with Tyson opening the feeding flap on the door, he "threw an open razor blade into his cell and started spraying him in the face with" chemical agents.  Doc. 11 at 6.

[10] The video reveals the flap is below the door window and at waist height.  That is consistent with Tyson's statement that he administered the chemical agents "striking Plaintiff in the upper torso" rather than as Plaintiff alleged, "spraying him in the face."

Plaintiff to have flushed the razor blade down the toilet, just as Tyson said it happened. *Id.*

At 1:38:09:671, all of the lights come on and members of the "response team" arrive at Plaintiff's cell.  Doc. 47, Ex. F.  At 1:47:52:531, Plaintiff is taken out of his cell and taken next door to the decontamination shower cell.  *Id.*  A "privacy shroud" is set up in front of the shower window while Plaintiff takes a shower.  *Id.*

A handheld camera is also used to document Plaintiff's removal from the cell and the post use of force procedures.  Doc. 47, Ex. G.  The time stamp on that camera is at 1:50 a.m. on January 1, 2011, when it begins to run.  *Id.*  While Captain Mathers makes a preliminary statement, which provides Tyson's statement of the use of force, Plaintiff can be heard yelling in the background that he has a witness, Michael Williams, and after he enters the shower cell, he is cursing and said, there is no razor in his cell.  *Id.* Plaintiff is told to be quiet, which he does not do, and claims he was set up by Tyson. Plaintiff says again, there is no razor.  *Id.*  Plaintiff is told again by Captain Mathers to take a 20-minute shower.  *Id.*  Throughout the shower, he periodically yells that "they set me up, they set me up good boy."  *Id.*  Plaintiff claims that Defendant Tyson did not go through the chain of command, did not follow proper procedures, and again denies several times that there was no razor in his room.  *Id.*

Several times Plaintiff makes statements that he needs the inspector, he also makes the suggestion to the camera, "I know he didn't put no razor in my room man." *Id.*  Plaintiff continues to assert that "he set me up."  At 8 minutes and fifteen seconds into the vide, a voice is heard from off camera yelling to Plaintiff: "Hey man, you got two witnesses upstairs."  Doc. 47, Ex. G.  Plaintiff immediately questions, "Where you at?

What room you in?" Captain Mathers steps in and directs Plaintiff to take his shower and be quiet. *Id.* Plaintiff continues to yell: "What room you in?" *Id.* "Boy you want a free transfer? Say what room you in, for real." *Id.* At 9:58, Plaintiff complains that he is going to have to go to the "psych cell" and says it is cold. *Id.* Plaintiff begins acting out for the camera, and at 10:31 states: "There is an open razor in here somewhere if he hasn't flushed it." *Id.* At 11:50 minutes into the recording, Plaintiff says, "Don't put no razor in my room Sgt. Tyson" and again claims he has been set up. *Id.*

Nearly the entire duration of the 20-minute shower, Plaintiff is disruptive, yelling into the unit, talking directing to the camera, and the like. Plaintiff continues to threaten to file a law suit, contact the NAACP, denies that he had a razor in his cell, and wants to see the inspector. *Id.*

Plaintiff swears on his grandmother's grave that if his witness will provide a statement for Plaintiff, Plaintiff will ensure that he receives a transfer as well as $500.00. *Id.* Plaintiff informs the camera operator that in the event prison officials freeze Plaintiff's inmate trust account, Plaintiff will have the money redirected to another inmate's trust account. *Id.* Plaintiff continues his disruptive behavior, making outbursts and accusations against Defendant Tyson and eventually Captain Mathers. *Id.*

When Plaintiff is given a towel to dry off, Plaintiff smiles and laughs for the camera and claims he was sprayed "like a roach." *Id.* Plaintiff jokes over and over that he was sprayed like a roach. *Id.* Plaintiff continues to demand to see the inspector and says he needs the nurse to give him a shot because he says he is allergic to mace. *Id.* He claims he is burning and at 2:18, a nurse is called to Plaintiff's cell for a post use of force examination. *Id.* Plaintiff is asked if he tried to hurt himself, and he said: "No, I'm

not a psych." *Id.* He says he is "itching and burning" all over. *Id.* He demands that he

be taken to a "psych cell" and yells, "I need to go now; I need to go to Psych Cell." *Id.*

At 33 minutes into the video, Plaintiff can be seen smiling through the shower

door window. *Id.* He continues to be disruptive, yelling, and acting like he is in a boxing

match with the camera operator. *Id.* It takes a while for Plaintiff to comply with orders

to cuff up and be removed from the shower. *Id.* As Plaintiff is removed from the

shower area, he yells out that he is burning. *Id.* Plaintiff continues to yell to other

persons, and claiming he was set up. *Id.* As Plaintiff exists the door from the dormitory

housing area, at approximately 40:22 on the footage Plaintiff says that it was his razor

and "there ain't no cuts on me man." *Id.* While Plaintiff is escorted across the

compound, he talks nearly the whole time saying he got no cuts and it's a "bogus DR,"

and said Tyson threw a razor in his room. *Id.*

Plaintiff arrives at the infirmary, and suddenly bends over forward as though he

were injured, despite no demonstration of any injury prior to arriving at the infirmary,

and yelling that he is "burning" and "he set me up." *Id.* Plaintiff continues his disruptive

behavior, ignoring the instruction from Captain Mathers again to cease his behavior. *Id.*

Plaintiff begins yelling out that he is burning, and tells the nurse he is burning all over.

*Id.* Once Plaintiff is secured in a cell, the handcuffs are removed from Plaintiff. *Id.* As

soon as Plaintiff is in the cell by himself, he yells for the camera, jumps up and down,

and acts out when officers try to get Plaintiff out of his clothes and into the "turtle suit."

*Id.* At the end of the video footage, Captain Mathers places herself between Plaintiff's

cell and the camera to state that the post use of force video is concluding, and during

the entire time, Plaintiff can be seen in the background dancing, smiling, yelling,

singing, and acting like he is boxing at the camera.  *Id.*  The video concludes with

Captain Mathers stating that no injuries were identified on Plaintiff.  *Id.*

Plaintiff did not submit an affidavit in support of his allegations.  Plaintiff did,

however, provide as Exhibit C the discharge summary from Inpatient Mental Health

Care in which Plaintiff reported that "the officer said he was trying to cut himself with a

razor."  Doc. 76, Ex. C.  Plaintiff denied "any such attempt."  *Id.*  Plaintiff denied

thoughts of self harm or harm to others.  *Id.*

After the incident, Plaintiff made "allegations of excessive force" and claimed

"that he was set up, was not trying to kill himself, and that he didn't do anything to get

sprayed."  Ex. D (doc. 47-5 at 3). The investigation was closed on January 7, 2011, with

the finding that Plaintiff's allegations were "not supported by the evidence reviewed"

and, thus, "not substantiated."  *Id.*

The evidence submitted also reveals that Plaintiff's cell mate (Michael Williams)

declined the need for a post use of force physical because he suffered no injury of any

kind when chemical agents were dispersed.  Doc. 47, Ex. E.  Inmate Williams had

sufficient opportunity to cover up to protect himself from Tyson's warning that chemical

agents were about to be used.  *Id.*  Williams was then moved to a secure

decontaminated cell.  Ex. E at 1 (doc. 47-5).  Furthermore, Williams' witness statement

is that he "was asleep." doc. 76 at 45.

**Analysis**

   **Retaliation**

It has long been established that "prison officials may not retaliate against an

inmate for exercising a constitutionally protected right.  Since prisoners retain some first

amendment rights, a claim that prison officials retaliated for the exercise of a personal first amendment right states a claim." Adams v. James, 784 F.2d 1077, 1082 (11th Cir. 1986), *citing* Bridges v. Russell, 757 F.2d 1155 (11th Cir. 1985); *see also* Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997) (reversing the district court's dismissal of Mitchell's First Amendment claim for retaliation). "To prevail on a retaliation claim, the inmate must establish that: '(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [official's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action [the disciplinary punishment] and the protected speech [the grievance].'" O'Bryant v. Finch 637 F.3d 1207, 1212 (11th Cir. 2011), *quoting* Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008); *see also* Thomas v. Lawrence, 421 F.App'x 926, 928, 2011 WL 118249 at *2 (11th Cir. Jan. 14, 2011), *citing to* Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008). In other words, a prisoner must show that the Defendant's actions (in this case, a retaliatory urinalysis and subsequent disciplinary report as well as excessive use of force) was "*the result* of" the prisoner's grievance. Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003); O'Bryant, 637 F.3d at 1212.

Essentially, a court is required to evaluate retaliation claims in light of the totality of the situation. This demands presenting a sufficient factual picture within the complaint. Claims of retaliation by an inmate must therefore be factual and not merely conclusory, and great weight must be given to the judgment of prison administrators who are considered best able to run a prison institution.

A prisoner's filing of a grievance is protected speech under the First Amendment. Boxer X v. Harris, 437 F.3d 1107, 1112 (11th Cir. 2006). The evidence in this case establishes that Plaintiff filed a grievance against Defendant Tyson on December 16, 2010, concerning the urinalysis test and the response to that grievance was received by Plaintiff on or about December 30, 2011, just two days prior to the use of force. Doc. 47-2 at 1. Plaintiff had also submitted an earlier grievance against Tyson in March of 2010 concerning the charge that Plaintiff had lied in his witness statement. Doc. 76 at 31. Thus, Plaintiff has met the first part of a retaliation claim.

However, Plaintiff essentially has submitted several discreet retaliation claims. Each one must be evaluated in light of the evidence. Although this circuit has rejected a "but for" analysis of causation in resolving retaliatory claims (the prisoner would not have been transferred "but for" an assertion of constitutional rights), a court still must balance and accommodate the prison's legitimate needs and goals with the prisoner's constitutional rights. *See* Adams v. Wainwright, 875 F.2d 1536 (11th Cir. 1989) (finding Adams' evidence refuted his allegations of retaliation); Bell v. Wolfish, 441 U.S. 520, 546, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); Wolff v. McDonnell, 418 U.S. 539, 556, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). The Court must therefore determine whether the action by the prison authorities is reasonably related to a legitimate penological interest. *See* Rhodes v. Chapman, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981). Recognizing also that "first amendment rights are not absolute," Pell v. Procunier, 417 U.S. 817, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974), it must be determined whether "[l]egitimate policies and goals of the correction system" justified

the use of force or imposition of discipline. Adams v. James, 784 F.2d at 1081, *citing* Pell, 417 U.S. at 821.

Considering Plaintiff's first claim of retaliation, the undisputed evidence reveals that Plaintiff was given a disciplinary report in 2010 by Officer English for lewd and lascivious exhibition, and another disciplinary report for lying to staff by Defendant Tyson. Plaintiff did not suffer the use of force or be required to submit to a urinalysis for approximately nine months. It is true that "temporal proximity of retaliatory behavior to the filing of a grievance may serve as circumstantial evidence of retaliation." Cain v. Lane, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988); Gayle v. Gonyea, 313 F.3d 677, 683–84 (2nd Cir. 2002). Yet the reverse of that principle is also true and courts have held that prisoners do not show a causal connection in a retaliation claim when a temporal connection is lacking. *See* Stearns-Miller v. McNeil, 3:07cv222, 2008 WL 4164110, at *7 (N.D. Fla., Sept. 5, 2008) (finding "the facts do not suggest a temporal connection, as the threat occurred five or six months prior to the disciplinary report"). For example, in Ellis v. Danforth, 7:12cv85, 2012 WL 5183558, at *4 (M.D. Ga., Sept. 13, 2012), the court concluded that there was no "temporal proximity" between Defendants' alleged conduct and Plaintiff's protected speech because the alleged acts occurred more than a year later. In this case, events which took place in December of 2010 and January 1, 2011, are too removed in time from Plaintiff's March 2010 grievance. The first claim or retaliation must fail.

As for the second claim of retaliation, the only evidence before the Court is that Plaintiff was required to take a urinalysis by Defendant Tyson because his name appeared "on the random drug testing sheet from Tallahassee." Required Plaintiff to

take the test was not retaliation. Plaintiff did object to the procedures utilized by Defendant Tyson in taking the urinalysis, and the grievance was denied on December 30, 2010. Doc. 47, Ex. B (doc. 47-2 at 1). Plaintiff was eventually issued a disciplinary report by Officer Glombowski for the unauthorized use of drugs, but the disciplinary report was written after receipt of Plaintiff's urine specimen report from Alere Toxicology on January 6, 2011, a date *after* the use of force at issue in this case. Defendant Tyson did not write the disciplinary report,[11] but he was a witness to the disciplinary report in that he conducted the urinalysis, but Tyson did not sit as a team member or fact finder in Plaintiff's disciplinary hearing. In this circumstance, Plaintiff cannot claim that the events which transpired concerning the disciplinary report for unauthorized use of drugs is retaliation.

> If a prisoner is found guilty of an actual disciplinary infraction after being afforded due process and there was evidence to support the disciplinary panel's fact finding, the prisoner cannot later state a retaliation claim against the prison employee who reported the infraction in a disciplinary report. Whether an inmate actually committed the charged infraction or whether the disciplinary report falsely accuses the inmate are questions of fact that are decided by the disciplinary panel.

O'Bryant, 637 F.3d at 1215. In Plaintiff's situation, he was found guilty of the infraction as charged and lost gain time. Permitting a challenge to that result would invite "prisoners to petition the courts for a full retrial each time they are found guilty of an actual disciplinary infraction after having filed a grievance." *Id.* at 1216. Moreover, in this case, Defendant Tyson did not write the disciplinary report and, thus, there is no causal connection between Plaintiff's conviction on the disciplinary charge and Plaintiff's

---

[11] The report was written by Officer Glombowski, "while performing [his] secondary duties as urinalysis tester . . . ." Ex. A (doc. 47-1 at 1).

grievance, written nine months earlier. Thus, Plaintiff's conviction on the charge stands as a bar to this retaliation claim, <u>O'Bryant,</u> 637 F.3d at 1219, and Defendant's motion for summary judgment on this aspect of the retaliation claim should be granted.

That leaves Plaintiff's claim that the use of chemical agents was retaliatory, as Plaintiff asserted that Defendant Tyson provided a false underlying justification (Plaintiff's attempted suicide) to use chemical agents. The evidence does not support that claim either. The evidence here is that Plaintiff was seen by Tyson with a razor blade in his hand and refused to relinquish it. It would have been dangerous for Tyson to enter the cell to try and take the razor blade away as Plaintiff's weapon for self-harm could become a weapon against Defendant Tyson. Tyson used chemical force to quell a potentially harmful situation and to gain Plaintiff's compliance.

Plaintiff has attempted to claim that Defendant Tyson threw the razor blade into Plaintiff's cell, but Plaintiff has failed to bring forth any evidence to support that assertion. Although Plaintiff states over and over in the video evidence that he was "set up," Plaintiff admitted at least once that it was his razor. Furthermore, Plaintiff's story does not add up that if Defendant was attempting to plant evidence by throwing a razor blade into his cell, the razor would have been found and Defendant would not have flushed it down the toilet. Defendant would have needed the presence of the razor if that were the case. Rather, the undisputed evidence before the Court is that Plaintiff had the razor and then flushed it down the toilet in an effort to avoid confinement in a psych cell after Defendant Tyson used chemical agents to prevent Plaintiff from harming himself.

Furthermore, Plaintiff had alleged in the amended complaint that he was in his assigned cell, "sitting on his assigned 'upper bunk,' engaged in a conversation with roomate [sic], inmate Micheal [sic] Williams . . . about the new years that just came in." Doc. 11 at ¶12, p. 7. Plaintiff's own witness statement does not support that allegation because Michael Williams said he was "asleep."

Moreover, Plaintiff claimed Defendant Tyson came to Plaintiff's door and instructed him to come to the door. *Id.* at ¶13. Plaintiff said he could "clearly" see that Defendant Tyson already had his "pepper spray mace can already out of its carrying case and in his hand with the DCOC's issued seal broken." *Id.* Plaintiff alleged that Tyson "then simultaneously open the feeding flap on the Plaintiff's cell door and threw an open razor blade into his cell and started spraying him in the face with his FDOC's issued pepper spray mace . . . ." *Id.* at ¶14. The video evidence refutes that allegation. The evidence demonstrates that Tyson had only a flashlight in his hand when he approached Plaintiff's cell. Defendant Tyson spoke to Plaintiff at the cell door for a few seconds before reaching for the chemical agents.

Finally, the time when Tyson bends down in a movement consistent with spraying chemical agents in the door's flap is 1:31:42:156. *Id.* Tyson remains at Plaintiff's cell door until 1:32:34:875. *Id.* That provided sufficient time for Plaintiff to have flushed the razor blade down the toilet, just as Tyson said it happened. *Id.* The video supports Defendant's version of the events.

Plaintiff has provided no evidence to support his claim that Defendant Tyson threw a razor blade in Plaintiff's cell and no evidence to support his claim that Tyson's

conduct was retaliatory or excessive.  Defendant's summary judgment motion should be granted on this retaliation claim as well.

### Excessive Force

The Eighth Amendment forbids cruel and unusual punishment.  Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003).  "After incarceration, only the 'unnecessary and wanton infliction of pain' . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Id.* (other citations omitted).  A claim that prison officials unnecessarily used excessive physical force on a prisoner falls within the Cruel and Unusual Punishments Clause.  The core judicial inquiry for this claim is the standard set forth in Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986): "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm."  Hudson v. McMillian, 503 U.S. 1, 6, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992), *quoting* Whitley, at 320-21, 106 S.Ct. at 1085.  Analysis of an excessive force claim considers "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.' " Hudson, 503 U.S. at 7; *see also* Harris v. Chapman, 97 F.3d 499, 505 (11th Cir. 1996).  An "absence of serious injury" must also be considered.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, John v. Johnson, 414 U.S. 1033 (1973); *quoted in* Hudson, 503 U.S. at 9, 112 S.Ct. at 1000; *see also* Gilmere v. City of Atlanta, 774 F.2d 1495, 1500 (11th Cir. 1985).  The absence of

serious injury does not *necessarily* preclude a claim, yet the "Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " Whitley, 475 U.S. at 327, 106 S.Ct. at 1088 (other citations omitted), *quoted in* Hudson, 503 U.S. at 9-10, 112 S.Ct. at 1000.

Here, Plaintiff came forward with no evidence to demonstrate any injury. Notably, Plaintiff did not complain of any injury until he reached the infirmary and began complaining of "burning." Medical staff identified no injury to Plaintiff. The lack of any harm to Plaintiff as a result of the use of force indicates nothing more than a *de minimis* injury.

More importantly, the undisputed evidence in this case demonstrates that force was used to prevent Plaintiff from harming himself and to obtain Plaintiff's compliance with an order. The use of force was not excessive, but limited to that necessary for Plaintiff to comply. The use of force was also necessary as the video tape demonstrates Plaintiff's behavior was belligerent and disruptive. In bringing this action and failing to provide any evidence to support Plaintiff's claims, it is concluded that this action is malicious and was not brought in good faith. Summary judgment must be granted in Defendant's favor.

**Motion for Sanctions, doc. 49**

Defendant contends that Plaintiff's claimed injury[12] to his eyesight is false. Doc. 49 at 2. Defendant presented evidence with that motion which shows that Plaintiff's

---

[12] Plaintiff alleged that the chemical agents caused "permanent vision loss in both eyes." Doc. 49, *citing* doc. 11.

vision has improved since his incarceration and the use of force. *Id.* Plaintiff's vision on January 30, 2012, was "uncorrected 20/30 vision in his right eye, and uncorrected 20/20 vision in his left eye." Doc. 49 at 3. Upon admission into the Department of Corrections in early 2010, Plaintiff's vision was "20/40 vision in his right eye, and 20/30 vision in his left eye." *Id.* at 2. The record evidence shows improvement, and there is no evidence that Plaintiff sought treatment for a vision problem. Plaintiff's claimed injury is not supported by the evidence.

In response to that motion, Plaintiff has submitted a rather evasive response, suggesting that he did not "know that [his] vision was bad prior to January 1, 2011." Doc. 75. Plaintiff said that he had not experienced problems with his eyesight prior to May of 2011, and "only assumed that it came from the chemical agents . . . ." *Id.* at 2. Plaintiff said he did not lie or mislead the Court concerning his injuries, and requests that he not be required to pay attorney fees and costs in this case. *Id.*

Defendant's motion for sanctions, brought pursuant to Rule 11, demonstrates the falsity of Plaintiff's claims in this case and the lack of any injury. The motion, doc. 49, however does not request any particular sanction.

Pursuant to Rule 11, "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." FED. R. CIV. P. 11(c)(1). "A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(c)(4). "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on

motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fᴇᴅ. R. Cɪv. P. 11(c)(4). Plaintiff is pro se and was granted leave to proceed in forma pauperis in this case. Doc. 4. Monetary sanctions often have very little impact on pro se, in forma pauperis litigants. In this case, Plaintiff has been making partial payments toward the balance due on his filing fee, yet additional costs and fees may fail to impress upon Plaintiff the need for honesty in litigation.

Another avenue which would likely make that impression on Plaintiff is in Florida Statute § 944.279(1). That statute provides:

> At any time, and upon its own motion or on motion of a party, a court may conduct an inquiry into whether any action or appeal brought by a prisoner was brought in good faith. A prisoner who is found by a court to have brought a frivolous or malicious suit, action, claim, proceeding, or appeal in any court of this state or in any federal court, which is filed after June 30, 1996, or to have brought a frivolous or malicious collateral criminal proceeding, which is filed after September 30, 2004, or who knowingly or with reckless disregard for the truth brought false information or evidence before the court, is subject to disciplinary procedures pursuant to the rules of the Department of Corrections. The court shall issue a written finding and direct that a certified copy be forwarded to the appropriate institution or facility for disciplinary procedures pursuant to the rules of the department as provided in s. 944.09.

Fʟᴀ. Sᴛᴀᴛ. § 944.279(1). This case was not brought in good faith; it is malicious. Plaintiff failed to provide any meaningful evidence to support his case. Therefore, the motion for sanctions, doc. 49, should be granted and a certified copy of the order adopting this report and recommendation should be provided to the Florida Department of Corrections for appropriate disciplinary action to be imposed as a sanction for this false and malicious case.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant Tyson's motion for summary judgment, doc. 47, be **GRANTED**, and summary judgment be entered in Defendant's favor on all claims.  It is further **RECOMMENDED** that Defendant Tyson's motion for sanctions, doc. 49, be **GRANTED** and the Order adopting these recommendations include a finding that Plaintiff knowingly brought false and malicious information to this Court, which shall be sent by certified copy to the Florida Department of Corrections, and recommend appropriate disciplinary sanctions be taken against Plaintiff pursuant to Florida Statute § 944.279(1).

**IN CHAMBERS** at Tallahassee, Florida, on February 5, 2013.


 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**